Richard H. COLLINS, Barbara H. Collins
and Marvin S. Smith, Defendants
Below, Appellants,

v.

Richard A. BURKE and Alice B. Burke,
Plaintiffs Below, Appellees.

Supreme Court of Delaware.

Submitted March 12, 1980.

Decided July 3, 1980.

Richard H. Schliem, III (argued), Wilmington, for defendants–appellants.

David H. Williams (argued), of Morris, James, Hitchens & Williams, Wilmington, for plaintiffs–appellees.

Before McNEILLY, QUILLEN and HORSEY, JJ.

QUILLEN, Justice:

In this appeal from an opinion and order of the Court of Chancery [1] granting reformation of a deed's description of the property conveyed from the sellers, plaintiffs–appellees, the Burkes, to the defendants–appellants, the Collinses, we are asked to set aside the reformation order and reinstate the original conveyance. It is the defendants' position that the parties had never reached a specific mutual understanding and agreement as to exactly where the line between their adjoining properties should be drawn; and that therefore a "comparative standard" at variance with the description in the deed, which is required under Delaware law to justify reformation and shape the Court's decree, is lacking.

The Vice Chancellor heard extensive testimony as to how the mistake sought to be remedied by the Burkes' action for reformation occurred. The problem seems to have originated when in a subdivision plan executed in 1967 the surveyor hired by Burke, who was the developer of Corner Ketch Farms, a residential area in New Castle County where the properties are located, consulted only his office calculations taken during a 1959 survey rather than conducting a field study or referring to actual field notes. The 1959 survey was the original survey for Corner Ketch Farms, containing 13 lots but reserving 5 acres, which held a farmhouse, barn and other outbuildings, to Burke. When the surveyor at Burke's request executed the 1967 plan, in which Burke surrendered part of his retained acreage to create three new lots (Lots 14, 15 and 16) for development, the various buildings and their locations were not shown. Thus, the line between Burke's property and Lot 14 to the north, which was later acquired by the Collinses, was unwittingly drawn at a point on the plan where it actually bisected Burke's barn approximately two feet south of its northern wall, which faced Lot 14. This fact was not reflected on the 1967 subdivision plan, which was filed with the County and which served as the basis for the metes and bounds description prepared by the Collinses' attorney for the deed conveying Lot 14 from the Burkes to the Collinses.

Prior to the subdivision Burke had planted a row of shrubbery several feet north of the barn. This too was not recorded on either the 1959 or 1967 plans. He testified that he intended this line to serve not as the exact demarcation of the division but as a point close to it. He had assumed that the actual line was some three feet south of the shrubbery. Thus, he had thought to accomplish an estimated boundary line with responsibility for maintenance of the shrubbery being borne by the purchasers. When Burke received the 1967 plan from the surveyor, he assumed that it embodied his intention although given the absence of these landmarks on the plan, he had no way of knowing whether it did or not.

The Collinses purchased Lot 14 in May 1970. Before settlement, they inspected the lot and the 1967 survey map which showed a lot of .7492 acres. Mr. Collins had determined that he wanted a lot no smaller than three–quarters of an acre, and, according to the subdivision plan, Lot 14 fulfilled his desire and indeed his requirement.

According to Collins' testimony there had been no occasion when the exact location of the rear line was discussed. However, he

1. *Burke v. Collins*, Del.Ch., C.A. No. 5112 (1978).

testified that he had the impression the boundary line was near the line of shrubbery. At settlement, however, Burke initiated some discussion concerning the proximity of the rear line to the barn. He suggested adjusting the line in a northerly direction, thereby diminishing Lot 14, in order to have sufficient adjoining land upon which he could maintain the barn. This was unsatisfactory to Collins who again insisted on a three–quarter acre lot. Eventually the parties agreed that Burke would have a personal easement onto a portion of the property conveyed to Collins:

> "RESERVING, however, unto the parties of the first part hereto, [Burke] an easement for maintenance and ingress and egress purposes over *the area immediately adjacent to the barn on the premises of* the parties of the first part, said easement not to extend more than six feet beyond the *line of shrubbery near the division line between lands retained* by the parties of the first part, hereto, *and the lands hereby conveyed*, said easement to be terminated by either the destruction of the barn or the alienation by the parties of the first part by Deed, Will or Intestacy, of the lands and premises retained by them." (Emphasis added.)

The Vice Chancellor noted that the testimony established that even at this time neither party was aware that the deed description caused Lot 14 actually to encroach upon the Burke barn.

It was not until some eight months later, when Burke and the surveyor were surveying Lot 15 in preparation for development, that the mistake came to their attention. After recognizing that the angle of the rear line of Lot 15 did not correspond with the rear of Lot 14, the surveyor examined his field notes and discovered the actual line bisected the barn. Burke asked the surveyor to correct the matter, which he did by adjusting the rear lines of both lots on the 1967 plan to where he thought Burke wanted them, with the result that the revision showed Lot 14 to be ten feet shorter on one side and twenty feet shorter on the other. Burke signed the revision and had it filed with the County authorities as a minor sub-division revision. Neither Burke nor his surveyor notified Collins of what had transpired because, as the Vice Chancellor found, each assumed the other would do so.

Collins became aware of the revision in the spring of 1972 when in the course of refinancing his home he received a mortgagee survey from Burke's surveyor which showed that his lot had shrunken from .7492 to .691 acres, and the boundary with Lot 15 had been shortened from 215 to 205 feet. The plan on file in the County office confirmed the change, and an on–the–scene measurement conducted the next day indicated that the 215 foot boundary described in the deed made him the owner of the northernmost two feet of the Burke barn, a total area of approximately 73 square feet.

This litigation did not arise until 1976 when Burke decided to sell the barn and Collins notified the listing realtor of the problem. Burke thereupon requested reformation to locate the rear boundary three feet south of the shrubbery line, which he claimed was the parties' intention and which had been thwarted by the erroneous deed description of which neither was aware.

The Vice Chancellor, after hearing both parties' testimony, concluded that it had been Burke's intention and had also been within Collins' unexpressed contemplation that the rear boundary line should lie approximately three feet south of the shrubbery, and he ordered the deed reformed to reflect this conclusion. Then, since such a line would reduce the area of Collins' lot to less than three–fourths of an acre, he required Burke either to pay damages or to make up the difference with his other lands, at Collins' election, on the principle that he who seeks equity must do equity. The land to be used for this purpose lay to the west of the barn and continued up to the public road.

We are persuaded that reformation is the proper remedy in this case. The factual situation presented fulfills in our view, as it did in the Vice Chancellor's, the prerequisites for that remedy.

▆ The evidence overwhelmingly supports the Vice Chancellor's conclusion that the parties were laboring under a mutual mistake as to what the description in the deed actually conveyed, and never intended that Collins should be the owner of part of the barn. The Courts of this State have always insisted in reformation cases on a showing of mutual mistake or, in appropriate cases, unilateral mistake on plaintiff's part coupled with knowing silence on defendant's part. See, e. g., *Kern v. NCD Industries, Inc.*, Del.Ch., 316 A.2d 576 (1973); *Burris v. Wilmington Trust Company*, Del.Supr., 301 A.2d 277 (1972); *Gracelawn Memorial Park, Inc. v. Eastern Memorial Consultants, Inc.*, Del.Ch., 280 A.2d 745 (1971), aff'd per curiam, Del.Supr., 291 A.2d 276 (1972); *Colvocoresses v. W. S. Wasserman Co.*, Del.Ch., 28 A.2d 588 (1942). This requirement provides the reason why the written contract as it stands is erroneous and should be reformed.

▆ The second requirement, that there be clear and convincing evidence of what actually was the prior oral agreement between parties, that had been inaccurately expressed or omitted from the written contract, insists that a "comparative standard" be provided to the Court so that it will be told exactly what terms to insert in the contract [*Hob Tea Room, Inc. v. Miller*, Del.Supr., 89 A.2d 851 (1952); *Colvocoresses v. Wasserman, supra*, 28 A.2d at 590; Restatement of Contracts § 504, Comment (b) (1932); Williston on Contracts § 1548 (3rd Ed.) (1970)] rather than being put in the position of creating a contract for the parties. *Gracelawn Memorial Park, supra*, 280 A.2d at 748; *Hessler, Inc. v. Ellis*, Del.Ch., 167 A.2d 848 (1961). We find sufficient evidence of intention to justify reformation but find we must disagree with the precise result reached by the Vice Chancellor.

▆ The agreement between the parties was clearly shown to be an agreement to convey .7492 acres of land. Indeed, so vital was this provision to Mr. Collins that he was not willing to go through with the settlement unless it was realized. It is also clear that the parties contemplated a Col-

lins lot generally rectangular in shape which did not include the barn. The line drawn by the Vice Chancellor to effectuate what he saw as the original agreement between the parties as to where the rear boundary should be negated crucial aspects of the bargain. In particular, it converted a rectangular lot into an "L–shaped" parcel with a "dogleg" supplying the square footage needed to equal the acreage required by Collins. In our view, the alternative presented to Collins of collecting damages or taking other land, while perhaps an attractive alternative, does not reflect adherence to reformation concepts. There was certainly no agreement that Collins' lot should include the "dogleg" addition lying to the west near the public road. Rather, the plot plan generally indicates a regularly shaped, even–sided lot. We feel that the disposition below, while it attempted to straighten out one problem in the conveyance, ignored manifested intentions. The fact that Burke considered it necessary to include an easement for himself "over the area immediately adjacent to the barn on the premises of the parties of the first part" for the purpose of maintenance indicates it was not so clear and conclusive that both parties thought the land adjacent to the barn, up to a point three feet south of the shrubbery, had been retained by Burke. The shrubbery was approximately fourteen feet north of the barn. While the easement clause identifies the line of shrubbery as being "near the division line" between Burke's and Collins' land, it does not state with specificity the line's location. Despite the absence of a specific demarcation by the parties of where they thought the line was, they did have a specific agreement that the line would be drawn wherever it had to be in order to establish a lot of three–quarters of an acre, contiguous to the Burke property, and excluding the barn. The Vice Chancellor did his best to achieve a reasonable resolution of this dispute. But he overlooked the parties' unbending intentions as to lot size, which were clearly proven. Reformation is not a mandate to produce a reasonable result which will facilitate a reasonable use of the land such as establish-

ment of a salable lot. Rather, it is based on intention.

The resolution of reformation cases traditionally rests on their facts rather than on general principles of construction. *Colvocoresses v. Wasserman, supra,* 28 A.2d at 590. Therefore, while we must discern the true intent of the parties, we are also properly guided in our disposition of this case by looking at all the operating factors in deciding what the parties' ultimate intention was. Neither party would appear entitled to any special solicitude, Burke being an experienced developer, and Collins, an engineer. While bad faith was not established in the case, if it becomes necessary that in the resolution of this case one party must bear an inconvenience, it should be Burke, the seller, because he employed the surveyor who drew the incorrect plan while Collins had no direct part in causing the misunderstanding. As it stands now, Collins bears the undesired consequence of an oddly–shaped lot including land he never wished to own.

We feel that guided by the comparative standard of the agreement as to size, it is possible to reach a result in accord with the parties' original expressed intentions. Unfortunately, the expressed intentions were at variance with unexpressed assumptions and it is impossible to satisfy them both simultaneously without putting one party out. Also, perhaps unfortunately, the expressed intentions do not give an ideal neighborly arrangement in result. But we must be guided by those manifestations rather than the socially desirable result. Thus we find the reformation should be modified. Burke should convey to Collins all the land which would be between Collins' easterly and westerly boundary line if those lines were extended south to a point even with the barn, excluding the barn itself and the 73 square feet within it which were originally conveyed to him. That area shall be made up by moving the line as described in the deed south approximately six inches, wrapping around the barn. That

additional strip, taken across 132.78 feet, the width of the lot at that point excluding the barn area, should make up the 73 square feet.[2] This shall be Collins' property. We note that Burke still has his easement enabling him to maintain the barn to his satisfaction. The wording of the easement was broad enough to cover "adjacent lands" lying to either side of the barn as well as north of it.

We have considered whether, as defendants argue, the plaintiffs should have been barred from bringing their action for reformation because of either laches or unclean hands. We conclude that neither defense operates to bar the action.

The argument made is that the record establishes that Burke knew of the mistake in 1972 but did not bring this action until 1976, which amounts to an undue delay. Therefore the Collinses contend that allowing this action would violate the equitable doctrine of laches. They also point to the fact that the three–year period of the Statute of Limitations, 10 *Del.C.* § 8106, which could be invoked by the surveyor in any action against him, elapsed before Burke acted, and that they thus suffered the detriment of losing any cause of action against the surveyor for monetary damages.

The Vice Chancellor declined to rule in the Collinses' favor on this point below, and we agree with his conclusion that, in the absence of any showing that appellants suffered a detrimental change of position as a result of the delay, the action will not be barred by laches. *Shanik v. White Sewing Machine Corp.,* Del.Supr., 19 A.2d 831 (1941); *Bovay v. H. M. Byllesby & Co.,* Del.Ch., 12 A.2d 178 (1940). The running of the Statute of Limitations as to Collins' claim against the surveyor should be a factor for the Court to consider in determining whether an unreasonable delay has taken place to defendants' prejudice, but the Court is not bound to make a finding of laches where the particular circumstances would render the doctrine's application in-

---

2. For example, 132.78 feet by six inches would make up 66.39 square feet. Thus the strip, if we have calculated correctly, will be just over six inches in width.

equitable and unjust. *Bovay v. H. M. Byllesby, supra*, 12 A.2d at 190. In the disposition of this case below the Vice Chancellor allowed the Collinses to seek damages against Burke. Therefore it cannot be said that they were prejudiced by the statute's bar of any action against the surveyor.

The question of unclean hands is factual, and our review will be limited to an inquiry as to whether the findings below support the conclusion that the plaintiffs did not have unclean hands.

In his opinion the Vice Chancellor made specific findings that the plaintiff did not have guilty knowledge or notice of the mistake when he filed the subdivision revision and had not made any attempt to conceal the mistake when he became aware of it. These findings were supported by substantial evidence and it is not our function to disturb them on appeal. *Consolidated Fisheries Co. v. Consolidated Solubles Co.*, Del. Supr., 112 A.2d 30 (1955), *reargument denied and supplemented*, 113 A.2d 576 (1955).

The cause shall be remanded to the Court of Chancery for modification in accordance with this opinion.